MICHAEL H. RUBIN, State Bar No. 214636
ANTHONY J WEIBELL, State Bar No. 238850
STEPHEN N. GIKOW, State Bar No. 302484
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105-1126
Phone (415) 947-2000
Fax (415) 947-2099
Email: mrubin@wsgr.com;
aweibell@wsgr.com; sgikow@wsgr.com

*Attorneys for Defendant*
TURN INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ANTHONY HENSON and WILLIAM CINTRON,<br><br>    Plaintiffs,<br><br>    v.<br><br>TURN INC.,<br><br>    Defendant. | CASE NO.: 4:15-cv-01497-JSW<br><br>**TURN INC.'S NOTICE OF MOTION AND MOTION TO DISMISS (OR IN THE ALTERNATIVE TO STAY) THIS ACTION TO COMPEL ARBITRATION**<br><br>Date: July 24, 2015<br>Time: 9:00 AM<br>Dept.: 5<br>Before: Hon. Jeffrey S. White |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION .................................................................... v

STATEMENT OF THE ISSUES ........................................................................... v

SUMMARY OF ARGUMENT .............................................................................. vi

STATEMENT OF FACTS.................................................................................... 1

     A.     Plaintiffs Agreed to Arbitrate Disputes That in Any Way Relate to or Arise Out of Their Verizon Service. ................................................ 1

     B.     Verizon Created the Unique Identifier at Issue—the UIDH—in Part to Provide Tailored Advertising to Its Subscribers. ................................. 2

     C.     Turn Helps its Clients Implement Tailored Advertising Solutions........................ 3

     D.     Verizon Partnered With Turn so They Could Jointly Provide Tailored Advertising Services to Verizon Subscribers......................... 4

     E.     Plaintiffs' Counsel Originally Filed a Lawsuit Against Both Verizon and Turn Based on the Same Alleged Facts. ................................. 6

ARGUMENT ................................................................................................ 7

I.     THE COMPLAINT SHOULD BE DISMISSED TO COMPEL ARBITRATION........... 7

     A.     An Action is Properly Dismissed if All Claims Are Subject to Arbitration. .......... 7

     B.     A Valid Arbitration Agreement Encompasses All Claims in this Action.............. 8

     C.     Plaintiffs Cannot Evade Arbitration by Omitting Verizon as a Defendant........... 9

     D.     Equitable Estoppel Allows a Nonsignatory to Compel Arbitration. ................... 10

     E.     Plaintiffs Are Estoped from Avoiding Arbitration Because Their Claims Are Intertwined with Issues Subject to Mandatory Arbitration. .......................... 13

II.     IN THE ALTERNATIVE, THIS ACTION SHOULD BE STAYED. ............................ 14

CONCLUSION ............................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

## CASES

*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009) .................................................................10

*AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) ...........................................................7

*AT&T Tech., Inc. v. Commun. Workers of Am.*, 475 U.S. 643 (1986) ...........................................7

*Birmingham Assocs. Ltd. v. Abbott Labs.*,
   328 F. App'x 42 (2d Cir. 2009),
   *affirming* 547 F. Supp. 2d 295 (S.D.N.Y. 2008) ........................................................ vi, 1, 13

*Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126 (9th Cir. 2000) ................................ 7-8, 9

*Choctaw Generation L.P. v. Am. Home Assurance Co.*,
   271 F.3d 403 (2d Cir. 2001) .......................................................................................11

*Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*,
   748 F.3d 249 (5th Cir. 2014) .....................................................................................13

*Cuadras v. MetroPCS Wireless, Inc.*, No. CV 09-7897 CAS AJWX,
   2011 WL 11077125 (C.D. Cal. Aug. 8, 2011) ......................................................... 8-9

*Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213 (1985) ...............................................................8

*Fujian Pac. Elec. Co. v. Bechtel Power Corp.*, No. C 04-3126-MHP,
   2004 U.S. Dist. LEXIS 23472 (N.D. Cal. Nov. 18, 2004) ......................................15

*Glaude v. Macy's Inc.*, No. 12-CV-5179-PSG,
   2012 U.S. Dist. LEXIS 171418 (N.D. Cal. Dec. 3, 2012) ........................................7

*Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078 (9th Cir. 2008) ........................................... 10-11

*Hoffman v. Finger Lakes Instrumentation, LLC*,
   789 N.Y.S.2d 410 (Sup. Ct. 2005) ............................................................................11

*IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524 (7th Cir. 1996) ................................. 9, 10, 15

*Ikechi v. Verizon Wireless*, No. 10-4554, 2012 WL 3079254 (D. Minn. July 6,
   2012), *report and recommendation adopted sub nom. Albert v. Verizon
   Wireless*, No. 10-4554, 2012 WL 3079072 (D. Minn. July 30, 2012) .................................8

*In re Apple & AT&TM Antitrust Litig.*, 826 F. Supp. 2d 1168 (N.D. Cal. 2011) .........................12

*In re Apple iPhone 3G Prods. Liab. Litig.*,
   859 F. Supp. 2d 1084 (N.D. Cal. 2012) ..................................................................... *passim*

*In re Carrier IQ, Inc. Consumer Privacy Litig.*, No. C-12-2330-EMC, 2014 U.S.
   Dist. LEXIS 42624 (N.D. Cal. Mar. 28, 2014) ...................................................... 12-13

*JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004) ........................................................11

*Jones-Mixon v. Bloomingdale's, Inc.*, No. 14-cv-01103-JCS,
  2014 U.S. Dist. LEXIS 81073 (N.D. Cal. June 11, 2014) ...............................7, 9

*LaCourt v. Specific Media, Inc.*, 10-1256-GW(JCGx),
  2011 U.S. Dist. LEXIS 50543 (C.D. Cal. Apr. 28, 2011).....................................6

*Lagrone v. Advanced Call Ctr. Techs., LLC*, No. 13-213,
  2014 U.S. Dist. LEXIS 141497 (W.D. Wash. Oct. 2, 2014)...............................11

*Merrill Lynch Int'l Fin., Inc. v Donaldson*, 895 N.Y.S.2d 698 (Sup. Ct. 2010) ...........11

*Oakey v. US Airways Pilots Disability Income Plan*, 723 F.3d 227 (D.C. Cir. 2013) .....................7

*Preferred Home Inspections, Inc. v. Bellsouth Telecomms., LLC*, No. 3:14-cv-
  00673-MBS, 2014 WL 4793824 (D.S.C. Sept. 25, 2014) ...................................8

*Rhodall v. Verizon Wireless of E., L.P.*, No. 1:10-3195-MBS,
  2011 WL 4036418 (D.S.C. Sept. 9, 2011) ..........................................................8

*Riley v. BMO Harris Bank, N.A.*, No. 13-1677 (CKK),
  2014 U.S. Dist. LEXIS 103020 (D.D.C. July 29, 2014) ....................................13

*Santana v. Verizon Wireless*, No. 14-CV—0052-CVE-FHM,
  2014 WL 2116849 (N.D. Okla. May 21, 2014) ...................................................8

*Savage v. Glendale Union High School Dist. No. 205*,
  343 F.3d 1036 (9th Cir. 2003)........................................................................1, 8

*Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974)..............................................7-8

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*,
  198 F.3d 88 (2d Cir. 1999) ........................................................................10, 11

*Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*, 526 F.3d 38 (1st Cir. 2008) ...............9-10

*Uptown Drug Co. v. CVS Caremark Corp.*,
  962 F. Supp. 2d 1172 (N.D. Cal. 2013) ....................................................*passim*

*Williams v. MetroPCS Wireless, Inc.*, No. 09-22890-CIV,
  2010 WL 1645099 (S.D. Fla. Apr. 21, 2010)......................................................9

*Wince v. Easterbrooke Cellular Corp.*, 681 F. Supp. 2d 679 (N.D.W. Va. 2010)...........9

*WYS Design P'ship Architects, P.C. v. Bd. of Managers of the 285 Lafayette St.*
  *Condominium*, 29 Misc. 3d 1201(A) (N.Y. Sup. Ct. 2010) ...............................11

*Zuckerman v. CB Richard Ellis Real Estate Servs., LLC*, No. 653232/11,
  2013 N.Y. Misc. LEXIS 1938 (N.Y. Sup. Ct. May 3, 2013) .............................11

**STATUTES**

9 U.S.C. § 2 .......................................................................................................7

9 U.S.C. § 3 .....................................................................................................15

Federal Arbitration Act (9 U.S.C. §§ 2-4).................................................*passim*

## RULES

Fed. R. Civ. P. 12(b)................................................................................................v

Fed. R. Civ. P. 12(b)(1) .................................................................................... *passim*

Fed. R. Civ. P. 41(a)................................................................................................7

## MISCELLANEOUS

21 R. Lord, Williston on Contracts § 57:19 (4th ed. 2001)...........................................10

Restatement (Second) of Conflict of Laws ..................................................................11

Verizon Wireless' use of a Unique Identifier Header (UIDH),
      http://www.verizonwireless.com/support/unique-identifier-header-faqs/ (last
      visited May 15, 2015).................................................................................2, 3

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on July 24, 2015, at 9:00 a.m. in the courtroom of the Honorable Jeffrey S. White, United States District Court, Northern District of California, Oakland Division, Courtroom 5, 2nd Floor, 1301 Clay Street, Oakland, California, defendant Turn Inc. ("Turn") will, and hereby does, move the Court for an order dismissing the Complaint filed by plaintiffs ("Plaintiffs") on April 1, 2015 (ECF No. 1, the "Complaint" or "Compl."), or in the alternative, an order staying this action pending arbitration of all arbitrable issues. This motion is made pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and the Federal Arbitration Act (9 U.S.C. §§ 2-4) and on the grounds that Plaintiffs should be compelled by contract and equity to submit this dispute to arbitration. Although this motion, in the interests of judicial efficiency, raises only the issue of arbitration and does not raise other grounds for dismissing this action, Turn reserves all rights to assert additional defenses under Rule 12(b) if the relief sought by this motion is not granted.

This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the Declaration of Verizon Analyst Cherylene Paddock filed herewith, the Declaration of Verizon Analyst James Giotis filed herewith, the Declaration of Gregory Zidow filed herewith, the Declaration of Charlotte Narvaez filed herewith, the Declaration of Michael H. Rubin filed herewith, oral argument of counsel, and any other matter which may be submitted at the hearing.

**STATEMENT OF THE ISSUES**

1.      Should this action be dismissed because all of Plaintiffs' claims are subject to mandatory arbitration?

2.      In the alternative, if all claims are not arbitrable, should this action be stayed pending arbitration of all arbitrable issues?

# SUMMARY OF ARGUMENT

Plaintiffs are subscribers of Verizon's mobile Internet service. Like all Verizon subscribers, they agreed to arbitrate any dispute relating to or arising from their Verizon service. As part of its mobile Internet service, Verizon provides tailored advertising programs to its subscribers who do not choose to opt-out—a fact expressly disclosed in the agreements Plaintiffs entered into with Verizon and in Verizon's Privacy Policy, which the subscriber agreements incorporate by reference. In implementing the service, Verizon partnered with Turn to help deliver tailored ads to Verizon's subscribers. There would be no question that any claims arising from that service would be arbitrable had Verizon provided the tailored advertising directly. Plaintiffs cannot avoid arbitration and proceed against only Turn here simply because Verizon partnered with Turn so that they could jointly provide that same service.

Despite the close relationship between Turn and Verizon, Plaintiffs conspicuously omitted Verizon as a defendant and scrubbed nearly all references to Verizon's involvement in the alleged events from their Complaint. This attempt to hide Verizon's role in the alleged events stands in stark contrast to a prior lawsuit Plaintiffs' counsel filed against both Turn and Verizon, in which they alleged that Verizon and Turn acted "jointly" and "collectively" with respect to the events underlying Plaintiffs' complaint. Plaintiffs' counsel voluntarily dismissed that lawsuit just days before Verizon and Turn were to file a joint motion to compel arbitration pursuant to the Verizon subscriber agreement—filing this suit just days later.

Courts allow non-signatories to arbitration agreements to enforce them for just these reasons. *See Birmingham Assocs. Ltd. v. Abbott Labs.*, 328 F. App'x 42 (2d Cir. 2009); *Uptown Drug Co. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172, 1184-85 (N.D. Cal. 2013); *In re Apple iPhone 3G Prods. Liab. Litig.*, 859 F. Supp. 2d 1084 (N.D. Cal. 2012). Where, as here, the underlying issues are so intertwined with the arbitration agreement and two parties act jointly to provide a service integral to the underlying claims, signatories are routinely estopped from evading their arbitration obligations. Since, contrary to Plaintiffs' allegations, Turn and Verizon worked together to provide tailored advertising to Verizon's subscribers, Plaintiffs' Complaint must be dismissed to compel arbitration of their claims against Turn.

**STATEMENT OF FACTS**[1]

A.      **Plaintiffs Agreed to Arbitrate Disputes That in Any Way Relate to or Arise Out of Their Verizon Service.**

Plaintiffs are residents of New York and subscribers of Verizon's mobile Internet service. Compl. ¶¶ 16-17. Plaintiffs allege that they "subscribed to Verizon mobile cellular and data service for use with Internet-enabled smartphones ... to access Internet-based content." *Id*. Upon subscribing to Verizon's mobile Internet service—and before they could access the Internet through that service—Plaintiffs agreed to be bound by the terms of a Verizon subscriber agreement. *See* Declaration of Verizon Analyst Cherylene Paddock ("Paddock Decl.") ¶¶ 7-19 & Exhibits ("Ex.") A-1-A-8; Declaration of Verizon Analyst James Giotis ("Giotis Decl.") ¶¶ 5-17 & Ex. B-1, B-2. Key among those terms was an agreement to arbitrate all disputes arising from Plaintiffs' relationship with Verizon, including the mobile Internet service. The Verizon subscriber agreement conspicuously states:

> I UNDERSTAND THAT I AM AGREEING TO .... SETTLEMENT OF DIS-PUTES BY ARBITRATION INSTEAD OF JURY TRIALS, AND OTHER IM-PORTANT TERMS IN THE CUSTOMER AGREEMENT....
>
> **YOU AND VERIZON WIRELESS BOTH AGREE TO RESOLVE DIS-PUTES ONLY BY ARBITRATION** ... (1) THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT.... ANY DISPUTE THAT IN ANY WAY RELATES TO OR ARISES OUT OF THIS AGREEMENT OR FROM ANY EQUIPMENT, PRODUCTS AND SERVICES YOU RECEIVE FROM US ... WILL BE RESOLVED BY ONE OR MORE NEUTRAL ARBITRATORS....

Paddock Decl. ¶¶ 7, 11, 14, 17, 19 & Ex. A-1, A-3, A-6, A-7, A-8 (emphasis added); Giotis Decl. ¶ 16 & Ex. B-2.[2]

---

[1] In ruling on a Rule 12(b)(1) motion, courts may look beyond the pleadings to resolve factual disputes, and the burden is on the party opposing the motion to establish subject matter jurisdiction. *Savage v. Glendale Union High School Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

[2] An earlier version of the Verizon subscriber agreement read "any dispute that *results* from this agreement or from the Services you receive from us" instead of "any dispute that in any way *relates* to or *arises* out of this agreement or from any equipment, products and services you receive from us." *See* Giotis Decl. ¶ 9 & Ex. B-1. This difference is immaterial: both Plaintiffs agreed to the latter version, which is the version set forth above. *See* Paddock Decl. ¶¶ 14, 19; Giotis Decl. ¶ 16. And in any event, Plaintiffs' allegations plainly "relate," "arise" *and* "result" from the Verizon mobile Internet service. *See infra* Section I.B.

In those same Verizon subscriber agreements, Plaintiffs also acknowledged and agreed that Verizon could collect and use Plaintiffs' information pursuant to Verizon's Privacy Policy:

> We collect personal information about you. ... You can find out how we use, share and protect the information we collect about you in the Verizon Privacy Policy, available at verizon.com/privacy. By entering this Agreement, **you consent to our data collection, use and sharing practices described in our Privacy Policy**.

Paddock Decl., Ex. A-6 at 2, A-8 at 1-2 (emphasis added); Giotis Decl., Ex. B-2 at 23 (emphasis added). The Verizon Privacy Policy, incorporated by reference into the subscriber agreements, explained to Plaintiffs that they might see ads through the Verizon service: "You may see third-party advertisements on some Verizon websites, services, or devices." Declaration of Gregory Zidow ("Zidow Decl."), Ex. C-1-C-10. Verizon also disclosed in its Privacy Policy Summary (to which the subscriber agreement links) that it "may provide third-party advertisers with the ability to target their ads using geographic or *demographic information* about customers." *Id.*[3] Verizon made clear that subscribers could "opt-out of the relevant mobile advertising program" simply by following instructions linked to in the policy or by calling a listed phone number. *Id.*

### B.   Verizon Created the Unique Identifier at Issue—the UIDH—in Part to Provide Tailored Advertising to Its Subscribers.

As part of the services provided by Verizon to Plaintiffs, Verizon inserts a Unique Identifier Header ("UIDH") in the Internet transmissions made by its subscribers over the Verizon network.[4] The UIDH is an anonymous identifier that Verizon associates with mobile devices on its network.[5] When a subscriber navigates to a website, the subscriber's Internet browser sends a request that asks the website to respond with instructions for displaying the correct website content in the browser.[6] That request includes information such as the device type, screen size, and

---

[3] Verizon's Privacy Policy also clearly alerted subscribers to the fact that third parties might collect web browsing history. *See, e.g.,* Zidow Decl., Ex. C-1 at 1, C-10 at 3. But Turn does not do that: Turn's cookies are not used to track users' Internet activity in order to serve tailored advertising. *See* Declaration of Charlotte Narvaez ("Narvaez Decl.") ¶ 29.

[4] *See Verizon Wireless' use of a Unique Identifier Header (UIDH),* http://www.verizonwireless.com/support/unique-identifier-header-faqs/ (last visited May 15, 2015). The facts presented here apply to the relevant time frame alleged in the Complaint.

[5] *Id.*

[6] *Id.*

1   type of browser, so that the website knows how to display the website on the person's device.[7]

2   The UIDH is included in this information.[8] Among other things, the UIDH enables advertisers to

3   display to Verizon subscribers Internet ads that are more tailored to their interests.

4       Anonymous identifiers—which can be included in the header of Internet transmissions

5   (like the UIDH) or contained in "cookies" stored on a browser—are commonly used on the In-

6   ternet and facilitate many services, including tailored advertising. Narvaez Decl. ¶ 7. For exam-

7   ple, when Verizon ad partners see the UIDH, they can determine that the device being used is

8   part of a large group with certain demographic characteristics that an advertiser is trying to reach

9   and then serve the right advertisement.[9] Without these anonymous identifiers, subscribers might

10  be subjected to seeing the same ad campaigns over and over again indefinitely, or to seeing ads

11  that are completely irrelevant to their interests. *Id.*

12      **C.      Turn Helps its Clients Implement Tailored Advertising Solutions.**

13      Verizon partnered with Turn for the express purpose of providing Verizon subscribers

14  with tailored advertising based on the UIDH. *See* Narvaez Decl. ¶¶ 12-15 & Ex. D-1 (the Turn

15  Audience Platform Agreement). Turn is a recognized leader in Internet-based advertising solu-

16  tions—it acts as a middle-man between advertisers, service providers (like Verizon), and Internet

17  and mobile app users (like Plaintiffs). *Id.* ¶ 4.

18      As part of that role, Turn works with advertisers to manage and optimize their interac-

19  tions with ad exchanges. *Id.* These ad exchanges are like miniature stock markets where adver-

20  tisers and publishers buy and sell advertising space on the Internet that is auctioned off via real-

21  time bidding within milliseconds.[10] *Id.* ¶ 5. The primary goal of this process is to present more

22  relevant ads to users by giving advertisers access to non-personally identifying information pro-

23  vided by multiple third party data partners. *Id.* ¶¶ 5-6. Turn's third party data partners associate

24

25      [7] *Id.*
        [8] *Id.*

26      [9] *See Verizon Wireless' use of a Unique Identifier Header (UIDH),*
        http://www.verizonwireless.com/support/unique-identifier-header-faqs/ (last visited May 15,

27  2015).
        [10] Contrary to the allegations in the Complaint (¶ 19), Turn does not itself hold any auctions;

28  rather, Turn helps clients respond to bids sent by those hosting the auctions. Narvaez Decl. ¶ 5.

1   demographic information about a user with a unique, non-personal identifier, and then share the

2   identifier and associated demographic information with Turn. *Id*. ¶ 6. To enable the real-time

3   bidding that takes place on the ad exchanges and to keep the data from these data partners in

4   sync, Turn associates each data partner's unique, non-personal identifier (like the UIDH) with

5   one of Turn's unique, non-personal identifiers (a "Turn ID"). *Id*. ¶¶ 8-9. This is accomplished via

6   a synchronization process, sometimes referred to as cookie or ID syncing. *Id*. ¶ 9. The Turn ID is

7   stored in a cookie in a user's browser, as well as on Turn's servers. *Id*.

8        In addition to enabling the real-time bidding that takes place on the ad exchanges, ID

9   synchronization allows Turn to deliver other key features to users and Turn's customers. For ex-

10  ample, ID synchronization helps Turn remember that a user has opted out of Turn's tailored ad-

11  vertising. *Id*. ¶ 11. It also helps Turn deliver standard advertising features, such as "frequency

12  capping," which prevents users from seeing the same ad over and over again. *Id*.

13       **D.      Verizon Partnered With Turn so They Could Jointly Provide Tailored Ad-
                   vertising Services to Verizon Subscribers.**
14

15       One of the key benefits Turn afforded Verizon was Turn's ability to sync the UIDH with

16  the Turn ID to provide a better mobile Internet experience to Verizon subscribers by presenting

17  them with advertisements relevant to them in the apps they used and on the websites they visited.

18  *Id*. ¶ 14. Throughout the parties' relationship, Verizon vetted how its anonymous demographic

19  data would be incorporated into Turn's platform and how the UIDH would be associated with

20  the Turn ID. *Id*. ¶ 12. For subscribers who had not opted out of Verizon's advertising programs,

21  Verizon periodically sent Turn non-identifying demographic information associated with each

22  UIDH so that it could be used to tailor advertisements to Verizon subscribers and provide them

23  with a better Internet experience.[11] *Id*. ¶ 14. Turn did not use the data that Verizon (or any of

24  Turn's many other data partners) provided to develop other profiles, to attempt to ascertain user

25  preferences, or to try to personally identify Verizon subscribers. *Id*. ¶ 16.

26

27  _____

28       [11] For subscribers who opted out, Verizon did not provide any demographic data at all.

Verizon worked with Turn to design a solution that enabled Turn to handle advertising campaigns lasting more than one UIDH rotation, in part to account for advertising campaigns lasting longer than one UIDH rotation. *Id.* ¶ 18. Because Verizon changes the UIDH for a particular device on a regular basis, an essential part of the integration of the Verizon UIDH into Turn's system was to associate any new UIDH with the preceding UIDH when the UIDH rotated. *Id.* ¶ 17. When Turn encountered a new UIDH for a browser with an existing Turn ID during the ad-bidding process, Turn would overwrite the immediately preceding UIDH stored for the Turn ID with the new UIDH. *Id.* The UIDH was updated for the same reason Turn would engage in any ID synchronization: to preserve the continuity of the data Verizon provided to Turn to be associated with the UIDH and to allow Verizon data to be used in campaigns that last longer than one UIDH rotation period. *Id.* ¶ 19.

Contrary to Plaintiffs' allegations (Compl. ¶ 9), Turn honored opt-out choices. *Id.* ¶¶ 22-25.[12] Indeed, updating the UIDH helped Turn preserve opt-out preferences, both in the case where a subscriber had opted out of Verizon's marketing programs or where a subscriber had opted out of Turn's tailored advertising services. *Id.* ¶ 20. For example, updating the UIDH associated with a Turn ID helped to ensure that the subscriber's preference remained intact on Turn's servers when the UIDH rotated. *Id.* If Turn were to create a new Turn ID every time a UIDH associated with an existing Turn ID expired, the new Turn ID would not reflect the opt-out preferences of the old Turn ID. *Id.* ¶ 21.[13]

Nor did Turn "make an end-run around users' cookie blocking and deleting technologies," as Plaintiffs allege. Compl. ¶ 35. If Turn encountered a browser that did not have any Turn cookies stored on it, Turn had no way of knowing why no Turn cookies were present. *Id.* ¶ 25. The browser could have had its cookies—including Turn cookies—deleted or cleared, or it could be a new browser (perhaps on a new computer or device) on which Turn had not yet set a cookie.

---

[12] There was a period when a bug prevented subscribers from being able to *verify* that they were opted-out of Turn's advertising programs, but that bug in no way interfered with their ability to actually opt-out from tailored advertising. Narvaez Decl. ¶ 23.
[13] Turn no longer uses the UIDH for any purposes, as the partnership between Turn and Verizon ended for reasons unrelated to this case. Narvaez Decl. ¶ 30.

*Id.* In certain situations in the past, when Turn encountered a mobile browser with no Turn cookie, it set new cookies containing an existing Turn ID if the browser was identifiable to Turn based on identifiers passed to Turn during the real-time ad bidding process. *Id.* ¶ 26. This practice is common when using mobile identifiers like Verizon's UIDH, Apple's IDFA, or Google's Android ID when bidding on and delivering interest-based ads in apps on mobile devices. *Id.* ¶ 28. But where a browser was set to block cookies, that browser would have blocked Turn's cookies, too. *Id.* ¶ 25.

Thus, while Plaintiffs characterize Turn as "respawning" cookies, Turn's practices contrast sharply with cookie "respawning." Cookie respawning involves intentionally using non-cookie Internet browser storage technologies to back up data also stored in browser cookies for the express purpose of restoring that data when those cookies are deleted.[14] Turn has never "respawned" a cookie or any other identifiers that anyone deleted or cleared from a web browser. Turn only places *new* cookies on browsers using routine operations when it comes into contact with a browser that has no Turn cookie, irrespective of the presence or absence of the UIDH. This is commonplace in the online advertising industry and in no way reflects a desire to frustrate user choice.

**E.**   **Plaintiffs' Counsel Originally Filed a Lawsuit Against Both Verizon and Turn Based on the Same Alleged Facts.**

Plaintiffs' counsel previously filed a putative class action lawsuit against both Verizon *and* Turn, alleging that Verizon and Turn acted "jointly" and "collectively" with respect to the conduct at issue in the Complaint. *See* Declaration of Michael H. Rubin ("Rubin Decl."), Ex. E-1 (*Michael v. Verizon Commc'ns Inc.*, No. 15-0072, Dkt. No. 1 (S.D. Miss. filed Feb. 4, 2015), the "*Michael* Complaint") at ¶¶ 3, 4, 35; *see also id.* ¶¶ 34-36, 39, 43-45, 47-54, 57-58, 61-63, 73-74 (alleging collective conduct by "Defendants" without distinguishing between Verizon and Turn). Just days before Verizon and Turn were to file a joint motion to compel arbitration of that dis-

---

[14] *See LaCourt v. Specific Media, Inc.*, 10-1256-GW(JCGx), 2011 U.S. Dist. LEXIS 50543, at *2-*4 (C.D. Cal. Apr. 28, 2011) (explaining cookie "respawning" in the context of the Flash locally-stored object—or LSO—browser storage technology).

1   pute—and after they had invested the time and expense to prepare it—Plaintiffs' counsel volun-

2   tarily dismissed the *Michael* Complaint pursuant to Fed. R. Civ. P. 41(a). *See* Rubin Decl., Ex.

3   E-2 (*Michael v. Verizon Commc'ns Inc.*, No. 15-0072, Dkt. No. 12 (S.D. Miss. Mar. 26, 2015)).

4   Five days later, Plaintiffs' counsel filed this action, dropping Verizon and naming only Turn.

5       Because Plaintiffs cannot evade their arbitration obligations simply by dropping Verizon

6   as a defendant, Turn moves for an order dismissing this action to compel arbitration.

7   **<u>ARGUMENT</u>**

8   **I.   THE COMPLAINT SHOULD BE DISMISSED TO COMPEL ARBITRATION.**

9       **A.   An Action is Properly Dismissed if All Claims Are Subject to Arbitration.**

10       An action is properly dismissed for lack of subject matter jurisdiction under Fed. R. Civ.

11   P. 12(b)(1) if all claims are arbitrable under the Federal Arbitration Act (the "FAA"). *Glaude v.*

12   *Macy's Inc.*, No. 12-CV-5179-PSG, 2012 U.S. Dist. LEXIS 171418, at *9 (N.D. Cal. Dec. 3,

13   2012) ("[T]he court loses its subject matter jurisdiction over any claims subject to [an] arbitration

14   clause.") (citing *AT&T Tech., Inc. v. Commun. Workers of Am.*, 475 U.S. 643, 648-50 (1986));

15   *Oakey v. US Airways Pilots Disability Income Plan*, 723 F.3d 227, 231 (D.C. Cir. 2013) (affirm-

16   ing Rule 12(b)(1) dismissal as "arbitration provision deprived the district court of jurisdiction").

17       The FAA declares all arbitration agreements to be "valid, irrevocable, and enforceable"

18   as a matter of federal law. 9 U.S.C. § 2. Congress enacted the FAA to "revers[e] centuries of ju-

19   dicial hostility to arbitration agreements." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510

20   (1974). As the Supreme Court explained, "the FAA was designed to promote arbitration" by

21   "embodying a national policy favoring arbitration and a liberal federal policy favoring arbitration

22   agreements." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1749 (2011).

23       "A court's role in applying the FAA is 'limited to determining (1) whether a valid agree-

24   ment to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at is-

25   sue. If the response is affirmative on both counts, the [FAA] requires the court to enforce the ar-

26   bitration agreement in accordance with its terms.'" *Jones-Mixon v. Bloomingdale's, Inc.*, No. 14-

27   cv-01103-JCS, 2014 U.S. Dist. LEXIS 81073, at *9 (N.D. Cal. June 11, 2014) (granting motion

28   to dismiss to compel arbitration) (quoting *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126,

1131 (9th Cir. 2000)). The Supreme Court has made it absolutely clear that the FAA "leaves no place for the exercise of discretion by a district court"—rather, district courts must compel parties to arbitrate all claims covered by a valid arbitration agreement. *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

In ruling on a Rule 12(b)(1) motion, courts may look beyond the pleadings to resolve factual disputes, and the burden is on the party opposing the motion to establish subject matter jurisdiction. *Savage v. Glendale Union High School Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

### B.     A Valid Arbitration Agreement Encompasses All Claims in this Action.

Plaintiffs allege that they are Verizon subscribers who contracted to receive the Verizon mobile Internet service "to access Internet-based content." Compl. ¶¶ 16-17. When they purchased this service, Plaintiffs agreed to be bound by the arbitration agreement contained in their Verizon subscriber contracts. *See* Statement of Facts, Section A *supra*; Paddock Decl. ¶¶ 7, 11, 14, 17, and 19 & Ex. A-1, A-3, A-6, A-7, and A-8; Giotis Decl. ¶¶ 5-10, 13-17 & Ex. B-1, B-2. Pursuant to that agreement, Plaintiffs agreed to arbitrate "*any* dispute that *in any way relates to or arises out of* [their Verizon subscriber agreements] or from … services [they] receive from [Verizon]." Paddock Decl. ¶¶ 14, 17 & Ex. A-6, A-7; Giotis Decl. ¶ 9, 16 & B-2 (emphasis added).

There is no question that the Verizon subscriber arbitration agreement is valid and enforceable against Verizon subscribers, pre-paid and post-paid alike. *See*, *e.g.*, *Preferred Home Inspections, Inc. v. Bellsouth Telecomms., LLC*, No. 3:14-cv-00673-MBS, 2014 WL 4793824, at *2-6 (D.S.C. Sept. 25, 2014) (granting motion to compel arbitration against post-paid Verizon Wireless subscriber); *Santana v. Verizon Wireless*, No. 14-CV—0052-CVE-FHM, 2014 WL 2116849, at *2-3 (N.D. Okla. May 21, 2014) (same); *Ikechi v. Verizon Wireless*, No. 10-4554 (JNE/SER), 2012 WL 3079254, at *4-7 (D. Minn. July 6, 2012) (same), *report and recommendation adopted sub nom. Albert v. Verizon Wireless*, No. 10-4554 (JNE/SER), 2012 WL 3079072 (D. Minn. July 30, 2012); *Rhodall v. Verizon Wireless of E., L.P.*, No. 1:10-3195-MBS, 2011 WL 4036418, at *3-5 (D.S.C. Sept. 9, 2011) (same); *see also Cuadras v. MetroPCS Wireless*,

1  *Inc.*, No. CV 09-7897 CAS AJWX, 2011 WL 11077125, at *5-6 (C.D. Cal. Aug. 8, 2011)

2  (agreement to arbitrate enforceable against pre-paid subscriber); *Williams v. MetroPCS Wireless,*

3  *Inc.*, No. 09-22890-CIV, 2010 WL 1645099, at *4 (S.D. Fla. Apr. 21, 2010) (same); *Wince v.*

4  *Easterbrooke Cellular Corp.*, 681 F. Supp. 2d 679, 682 (N.D.W. Va. 2010) (same).

5      Similarly, Plaintiffs' arbitration agreement fully encompasses their Complaint in this ac-

6  tion because their Complaint "relates to" and "arises out of" their Verizon subscriber agreements

7  and from the services they received from Verizon. More specifically, their Complaint targets the

8  tailored advertising feature provided by Verizon—through its partner Turn—as part of the Veri-

9  zon mobile Internet service. Compl. ¶ 3; Narvaez Decl. ¶ 12. Plaintiffs could *only* have been af-

10 fected by the conduct alleged in the Complaint because they subscribed to the Verizon mobile

11 Internet service and agreed to the privacy terms that made the tailored advertising service pro-

12 vided by Verizon possible. *See* Statement of Facts, Section A *supra*. Although Plaintiffs claim

13 that they were not aware of this aspect of Verizon's mobile Internet service, they were informed

14 of, purchased, and agreed to receive it when they entered into their subscriber agreements with

15 Verizon. *Id*. And those subscriber agreements explicitly incorporated the Verizon Privacy Policy,

16 alerting subscribers to how the advertising program worked and specifically informing them how

17 they could opt-out. *Id*.

18     Because Plaintiffs' arbitration agreement is valid and covers the Complaint in this action,

19 "the FAA requires the court to enforce the arbitration agreement in accordance with its terms."

20 *Jones-Mixon*, 2014 U.S. Dist. LEXIS 81073, at *9 (quoting *Chiron*, 207 F.3d at 1130).

21     **C.    Plaintiffs Cannot Evade Arbitration by Omitting Verizon as a Defendant.**

22     Plaintiffs cannot evade their obligations under the arbitration clause of their Verizon sub-

23 scriber agreements simply by dropping Verizon. *See IDS Life Ins. Co. v. SunAmerica, Inc.*, 103

24 F.3d 524, 530 (7th Cir. 1996) (Posner, C.J.) (where plaintiff attempts to avoid arbitration by su-

25 ing a "related party with which it has no arbitration agreement, in the hope that the claim against

26 the other party will be adjudicated first and have preclusive effect in the arbitration[,] [s]uch a

27 maneuver should not be allowed to succeed"); *Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*, 526

28 F.3d 38, 40 (1st Cir. 2008) (rejecting plaintiffs' attempt to "escape arbitration of such disputes by

1  naming as defendants two non-signatories"); *Smith/Enron Cogeneration Ltd. P'ship, Inc. v.*

2  *Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999) (plaintiff cannot avoid arbitration

3  where it "intentionally did not sue" signatories to agreement).

4          Plaintiffs' counsel originally filed a lawsuit against both Turn *and* Verizon, alleging that

5  Verizon and Turn acted "jointly" and "collectively" with respect to the same conduct at issue in

6  in this action. *See* Rubin Decl., Ex. 1 ¶¶ 3, 4, 35; *see also id.* ¶¶ 34-36, 39, 43-45, 47-54, 57-58,

7  61-63, 73-74 (alleging conduct by "Defendants" collectively without distinguishing between

8  Verizon and Turn). But Plaintiffs' counsel dismissed that lawsuit and brought this one against

9  only Turn as part of a calculated maneuver to evade Plaintiffs' obligations under their arbitration

10  agreement. This sort of transparent gamesmanship "should not be allowed to succeed," and the

11  Court should dismiss Plaintiffs' action to compel arbitration of their claims. *IDS*, 103 F.3d at

12  530. Indeed, if Verizon had provided the tailored advertising feature to Plaintiffs using only its

13  own internal resources—instead of partnering with Turn to provide it jointly— there would be no

14  question that any claims arising from that feature would be subject to Plaintiffs' arbitration

15  agreement. That Verizon chose to partner with Turn does not alter the analysis. Plaintiffs pur-

16  chased Verizon's Internet services as a total package, and tailored advertising was one aspect of

17  that package, regardless of how Verizon chose to implement it.

18          **D.      Equitable Estoppel Allows a Nonsignatory to Compel Arbitration.**

19          Nonsignatories to an arbitration agreement may compel signatory plaintiffs to arbitrate a

20  dispute where ordinary principles of state contract law allow them to do so. *Arthur Andersen*

21  *LLP v. Carlisle*, 556 U.S. 624, 632 (2009). These principles include "assumption, piercing the

22  corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and

23  estoppel." *Id.* at 631 (quoting 21 R. Lord, Williston on Contracts § 57:19, p 183 (4th ed. 2001)).

24  Here, because New York law governs Plaintiffs' Verizon subscriber agreements, New York law

25  will determine whether Plaintiffs may be compelled to arbitrate their claims against Turn.[15] But

26

27          [15] Because Plaintiffs used New York area codes, their subscriber agreements instruct that
New York law governs those agreements. *See* Paddock Decl. Ex. A-6, A-8, A-9; Giotis Decl. Ex.
28  B-1, B-2; *Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008) (courts sitting in
(continued...)

as discussed below, the result is the same here whether New York or California law applies.

Under the rule adopted by New York courts, a signatory to an arbitration agreement is estopped "from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 415 (Sup. Ct. 2005) (granting motion to compel arbitration brought by non-signatory); *accord Zuckerman v. CB Richard Ellis Real Estate Servs., LLC*, No. 653232/11, 2013 N.Y. Misc. LEXIS 1938, at *1 (N.Y. Sup. Ct. May 3, 2013) (same); *Merrill Lynch Int'l Fin., Inc. v Donaldson*, 895 N.Y.S.2d 698, 704 (Sup. Ct. 2010) (same); *WYS Design P'ship Architects, P.C. v. Bd. of Managers of the 285 Lafayette St. Condominium*, 29 Misc. 3d 1201(A) (N.Y. Sup. Ct. 2010) (same).

The Second Circuit applies a similar standard focusing on the parties' relationship and whether the issues are intertwined with the agreement at issue to allow nonsignatory defendants to enforce arbitration agreements against signatory plaintiffs. *See, e.g.*, *Birmingham Assocs. Ltd. v. Abbott Labs.*, 328 F. App'x 42 (2d Cir. 2009), *affirming* 547 F. Supp. 2d 295 (S.D.N.Y. 2008); *JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 178 (2d Cir. 2004); *Choctaw Generation L.P. v. Am. Home Assurance Co.*, 271 F.3d 403, 406-407 (2d Cir. 2001); *Smith/Enron Cogeneration L.P., Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999).

While New York law plainly governs this question, two California cases are particularly instructive as they involve similar factual scenarios. In those cases, the district courts applied the more narrowly-phrased California test[16] and allowed nonsignatories to enforce the arbitration

---

(...continued from previous page)

diversity look to the law of the forum state to choose the law that applies to the enforceability analysis; under California law, the contract's choice of law will govern unless section 187(2) of the Restatement (Second) of Conflict of Laws dictates a different result); *Lagrone v. Advanced Call Ctr. Techs., LLC*, No. 13-213, 2014 U.S. Dist. LEXIS 141497, at *10-11 (W.D. Wash. Oct. 2, 2014) (under the Restatement, the state law chosen by the arbitration agreement determines whether a nonsignatory can compel arbitration).

[16] The California test has been articulated as follows: "[W]here a nonsignatory seeks to enforce an arbitration clause, the doctrine of equitable estoppel applies in two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct

(continued...)

1   agreements. *See Uptown Drug Co v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172 (N.D. Cal.

2   2013); *In re Apple iPhone 3G Prods. Liab. Litig.*, 859 F. Supp. 2d 1084 (N.D. Cal. 2012). In

3   *iPhone*, the court allowed Apple, a nonsignatory defendant, to enforce an arbitration agreement

4   against signatory plaintiffs who alleged that Apple misrepresented the speed at which the iPhone

5   would perform on the AT&T wireless network. 859 F. Supp. 2d at 1093-94. The court found that

6   the claims against Apple were "intertwined" with the plaintiffs' AT&T subscriber contracts con-

7   taining the arbitration clause because the plaintiffs only had access to the AT&T network by en-

8   tering into the AT&T subscription agreement and would not have suffered the alleged injury had

9   they not entered into that agreement. *Id.* at 1094 & n.32, 1096. The court also noted that the

10  plaintiffs had alleged in prior complaints that the defendants had a close relationship, indicating

11  that the alleged misconduct was interdependent and concerted. *Id.* at 1096-97; *see also In re Ap-*

12  *ple & AT&TM Antitrust Litig.*, 826 F. Supp. 2d 1168, 1178 (N.D. Cal. 2011) (plaintiffs were es-

13  topped from refusing to arbitrate claims against Apple where they previously alleged Apple and

14  ATTM "jointly subverted rights under the contract").

15          Similarly, in *Uptown Drug*, the court held that a signatory plaintiff was estopped from

16  avoiding arbitration with nonsignatory defendants that had allegedly misappropriated the plain-

17  tiff's customer information. 962 F. Supp. 2d at 1184. Even though the plaintiff did not mention

18  or rely on the contract containing the arbitration clause to support its claims, the court found that

19  absent the contract, the plaintiff "would have no claims against Defendants with respect to the

20  customer information at issue, because in that scenario, [plaintiff] would not have been required

21  to disclose such information to Defendants." *Id.* at 1185-86. The misappropriation claims were

22  thus "intertwined" with the arbitration agreement because "the question of whether [the defend-

23  ant] was to any extent barred from disclosing or using [the plaintiff's] customer data must be an-

24  swered by looking at the terms of the [contract containing the arbitration clause]." *Id.*[17]

25

26              (...continued from previous page)
    [are] founded in or intimately connected with the obligations of the underlying agreement." *Up-*
27  *town Drug Co. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172, 1184-85 (N.D. Cal. 2013).
    [17] In contrast to *Uptown Drug*, the decision in *Carrier IQ* is an outlier: it did not allow a non-
28  signatory defendant to enforce an arbitration clause in a contract raised by the defendant as a de-
                                                                                   (continued...)

**E.      Plaintiffs Are Estopped from Avoiding Arbitration Because Their Claims Are Intertwined with Issues Subject to Mandatory Arbitration.**

Just as in *iPhone* and *Uptown Drug*, Plaintiffs' claims against Turn are intertwined with their Verizon subscriber agreements, and there is no question that their claims are grounded in interdependent conduct between Verizon and Turn. They are therefore estopped from avoiding arbitration.

*First*, the subscriber agreement is what gave Plaintiffs access to the Verizon Internet service that underlies their claims. Had Plaintiffs not entered into their subscriber agreements, they could not have been affected by the alleged conduct. *See* Statement of Facts, Sections A-D *supra*; *iPhone*, 859 F. Supp. 2d at 1096; *see also Riley v. BMO Harris Bank, N.A.*, No. 13-1677 (CKK), 2014 U.S. Dist. LEXIS 103020, at *18-19 (D.D.C. July 29, 2014).

*Second*, Turn used the UIDH *only* because Turn partnered with Verizon to do so as part of Verizon's provision of targeted advertising to its subscribers. Narvaez Decl. ¶ 12 & Ex. D-1. Turn would never have used the UIDH had it not partnered with Verizon, and Turn's use of cookies was an integral part of this process. *Id.* ¶¶ 7-9. While Plaintiffs now claim to be dissatisfied with this single aspect of Verizon's services, they purchased the services as a whole and agreed to arbitrate disputes arising out of or relating to their use of those services.[18]

_____

(...continued from previous page)
fense to the plaintiffs' allegations. *In re Carrier IQ, Inc. Consumer Privacy Litig.*, No. C-12-2330-EMC, 2014 U.S. Dist. LEXIS 42624 (N.D. Cal. Mar. 28, 2014). The court misapplied the law, giving an unduly narrow reading to California law (and significantly narrower than New York law) because it did not want to "expand" California equitable estoppel law where the defendants "cited no case where defendant's reliance on a contract justifies the application of equitable estoppel against the plaintiff who does not rely on the contract." *Id.* at *43. But the court did not consider *Uptown Drug*; nor did it consider *Birmingham*, 328 F. App'x 42 (nonsignatory defendant allowed to compel arbitration against signatory plaintiff where contract containing arbitration clause was raised as a defense to plaintiff's claims), *affirming* 547 F. Supp. 2d 295, or *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 261-62 (5th Cir. 2014) (California law would require signatory plaintiff to arbitrate even where contract containing the arbitration clause was relevant only as a defense). *Carrier IQ* is thus based on an incomplete view of the law. In any event, it is also distinguished from the present action because, unlike here, the nonsignatories' actions in *Carrier IQ* went "beyond" the scope of the contract containing the arbitration clause. 2014 U.S. Dist. LEXIS 42624, at *53-54.
[18] Verizon subscribers not wishing to participate in Verizon's tailored advertising can simply opt out. *See* Statement of Facts, Section A *supra*.

*Third*, Plaintiffs' claims are based on interdependent and concerted conduct by Verizon and Turn. Verizon partnered with Turn for the express purpose of providing Verizon subscribers, including Plaintiffs, with tailored advertising that leveraged the UIDH. *Id.* ¶ 12 & Ex. D-1. And Verizon cooperated in Turn's use of the UIDH for the express purpose of delivering tailored advertisements to its subscribers. *Id.* ¶¶ 12-19. This was all done in an effort to deliver tailored Internet ads to Plaintiffs—one aspect of Plaintiffs Verizon mobile Internet service.

*Fourth*, whether Plaintiffs were on notice of and authorized the alleged activities "must be answered by looking at the terms of [Plaintiffs' subscriber agreements]." *Uptown Drug*, 962 F. Supp. 2d at 1185. Plaintiffs cannot unilaterally avoid arbitration by omitting any reference to their subscriber agreements in the Complaint. *Uptown Drug Co.*, 962 F. Supp. 2d at 1185.

*Fifth*, because Plaintiffs claims are based on Verizon and Turn's interdependent conduct, Plaintiffs' claims against Turn *necessarily* rely on the relationship between Verizon and Plaintiffs created by their subscriber agreements. Plaintiffs' choice not to name Verizon as a defendant cannot change the fact that their "core allegations" will require an extensive examination of their subscriber agreements to determine whether Turn's conduct was authorized. *iPhone*, 859 F. Supp. 2d at 1096.

For all of these reasons, the issues in this lawsuit are inextricably intertwined with Plaintiffs' Verizon subscriber agreements and based on interdependent conduct of Turn and Verizon that is covered by those agreements. Plaintiffs are therefore estopped from avoiding arbitration of their claims, and this action should be dismissed to compel arbitration of Plaintiffs' claims.

## II.   IN THE ALTERNATIVE, THIS ACTION SHOULD BE STAYED.

For the reasons explained above, both claims asserted by Plaintiffs in this action are arbitrable, and the action should be dismissed to compel Plaintiffs to arbitrate those claims on an individual basis. But if the Court decides not to dismiss Plaintiffs' claims, this action should be stayed to compel Plaintiffs to resolve all arbitrable issues through arbitration. *Uptown Drug*, 962 F. Supp. 2d at 1187 (staying case pending resolution of arbitration). "The FAA provides that 'upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which the suit is pending, upon being satisfied that the issue involved in such suit or

1   proceeding is referable to arbitration under such an agreement, *shall* on application of one of the

2   parties stay the trial of the action until such arbitration has been had in accordance with the terms

3   of the agreement[.]'" *Id.* (quoting 9 U.S.C. § 3) (emphasis added).

4          A stay is also required to prevent prejudice to nonparty Verizon. "Prejudice to a third par-

5   ty undeniably provides a basis for staying litigation pending arbitration of a related dispute." *Fu-*

6   *jian Pac. Elec. Co. v. Bechtel Power Corp.*, No. C 04-3126-MHP, 2004 U.S. Dist. LEXIS 23472,

7   *24-25 (N.D. Cal. Nov. 18, 2004) (staying action to prevent prejudice to nonparties that had an

8   arbitration agreement with plaintiff) (citing *IDS*, 103 F.3d at 530). Verizon has a substantial in-

9   terest in the outcome of this litigation and will be the focal point of all evidence in this action to

10  show that Verizon partnered with Turn to perform the tailored advertising services about which

11  Plaintiffs complain. *See* Narvaez Decl. ¶¶ 12-30. The burden of litigating nonparty discovery,

12  and the preclusive effect of decisions in this action on any arbitration between Plaintiffs and Ver-

13  izon, would work a substantial prejudice on Verizon if this action were not stayed pending arbi-

14  tration of all issues involving Verizon. In essence, Plaintiffs seek to circumvent their arbitration

15  agreement by using this lawsuit to indirectly harass Verizon in ways that would not be available

16  in arbitration. "Such a maneuver should not be allowed to succeed." *IDS*, 103 F.3d at 530.

17                                          **CONCLUSION**

18         For the foregoing reasons, Plaintiffs' action should be dismissed or, in the alternative,

19  stayed pending arbitration of all arbitrable issues.

20

21  Dated: May 15, 2015                         WILSON SONSINI GOODRICH & ROSATI
                                                Professional Corporation
22
                                                By: /s/ *Michael H. Rubin*
23                                                  Michael H. Rubin

24                                              *Attorneys for Defendant*
                                                TURN INC.
25

26

27

28