1   Michael W. Sobol (CA 194857)
    msobol@lchb.com
2   Nimish R. Desai (CA 244953)
    ndesai@lchb.com
3   LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
4   275 Battery Street, 29th Floor
    San Francisco, CA 94111-3339
5   Telephone: 415.956.1000
    Facsimile: 415.956.1008
6
7   Nicholas Diamand
    ndiamand@lchb.com
8   LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
9   250 Hudson Street, 8th Floor
    New York, NY 10013-1413
10  Telephone: 212.355.9500
    Facsimile: 212.355.9592

11  Hank Bates (CA 167688)                    Bradley S. Clanton
    hbates@cbplaw.com                         brad@clantonlegalgroup.com
12  CARNEY BATES & PULLIAM PLLC               CLANTON LEGAL GROUP PLLC
    2800 Cantrell Road, Suite 510             627 Mohawk Avenue
13  Little Rock, AR 72202                     Jackson, MS 39216
    Telephone: 501.312.8500                   Telephone: 601-454-8794
14                                            Facsimile: 866-421-9918
    *Attorneys for Plaintiffs and the Proposed*
15  *Class*

16                  UNITED STATES DISTRICT COURT

17                NORTHERN DISTRICT OF CALIFORNIA

18                       OAKLAND DIVISION

19  ANTHONY HENSON and WILLIAM          Case No. 4:15-cv-1497-JSW
    CINTRON,
20                                      **PLAINTIFFS' OPPOSITION TO TURN'S
                      Plaintiffs,       MOTION TO DISMISS (OR IN THE
21                                      ALTERNATIVE TO STAY) THIS ACTION
    v.                                  TO COMPEL ARBITRATION**
22
    TURN, INC.,                         Date:       August 21, 2015
23                                      Time:       9:00 AM
                      Defendant.        Courtroom:  5
24                                      Before:     Hon. Jeffrey S. White

25

26          REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

27

28

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF THE ISSUE .............................................................................. 1

II.   SUMMARY OF ARGUMENT ............................................................................. 1

III.  STATEMENT OF FACTS ................................................................................... 2

    A.    Turn surreptitiously tracked Plaintiffs. ................................................... 2

    B.    Verizon's arbitration clause does not benefit Turn, which is independent of
Verizon by the terms of their agreement. ............................................... 5

IV.   ARGUMENT ...................................................................................................... 5

    A.    The relevant legal question is whether Plaintiffs seek to access rights in
Verizon's contract while avoiding an obligation to arbitrate that appears in
the same contract. .................................................................................. 6

        1.    Under either body of law, estoppel does not apply unless the
plaintiff's claims rely on a contract containing an arbitration clause. ........ 7

            a.    Ninth Circuit/California ................................................. 8

            b.    Second Circuit/New York ............................................ 10

        2.    Turn's cases do not require Plaintiffs to arbitrate their claims
against Turn. ........................................................................ 12

        3.    Summary ............................................................................. 14

    B.    Estoppel does not require Plaintiffs to arbitrate their claims against Turn. .......... 15

V.    CONCLUSION ................................................................................................. 17

# TABLE OF AUTHORITIES

Page

**Cases**

*Arthur Anderson LLP v. Carlisle,*
  556 U.S. 624 (2009) ..................................................................................... 7

*AT&T Mobility LLC v. Concepcion,*
  131 S. Ct. 1740 (2011) ................................................................................. 6

*Birmingham Assocs. Ltd. v. Abbott Labs.,*
  328 F. App'x 42 (2d Cir. 2009) ................................................................... 14

*Bowery Presents LLC v. Pires,*
  2013 N.Y. Misc. LEXIS 2678 (N.Y. Sup. Ct. June 24, 2013) ..................... 12

*Butto v. Collecto Inc.,*
  845 F. Supp. 2d 491 (E.D.N.Y. 2012) ......................................................... 12

*Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.,*
  271 F.3d 403 (2d Cir. 2001) ................................................................. 10, 14

*Comer v. Micor, Inc.,*
  436 F.3d 1098 (9th Cir. 2006) ..................................................................... 6

*Denney v. Jenkens & Gilchrist,*
  412 F. Supp. 2d 293 (S.D.N.Y. 2005) ......................................................... 12

*Different Drummer LLC v. Nat'l Urban League, Inc.,*
  No. 11-4982, 2012 U.S. Dist. LEXIS 16494 (S.D.N.Y. Feb. 7, 2012) ......... 11, 15

*Goldman v. KPMG LLP,*
  92 Cal. Rptr. 3d 534 (Cal. Ct. App. 2009) ................................................... 9

*Hoffman v. Finger Lakes Instrumentation, LLC,*
  789 N.Y.S.2d 410 (Sup. Ct. 2005) .......................................................... 7, 13

*Homedics, Inc. v. Valley Forge Ins. Co.,*
  315 F.3d 1135 (9th Cir. 2002) ..................................................................... 7

*In re Apple iPhone 3G Prods. Liab. Litig.,*
  859 F. Supp. 2d 1084 (N.D. Cal. 2012) ................................................ 6, 12, 13

*In re Carrier IQ, Inc. Consumer Privacy Litig.,*
  No. 12-2330, 2014 U.S. Dist. LEXIS 42624 (N.D. Cal. Mar. 28, 2014) ...... passim

*JLM Indus., Inc. v. Stolt-Nielsen SA,*
  387 F.3d 163 (2d Cir. 2004) ................................................................. 2, 10, 14

*Kramer v. Toyota Motor Corp.,*
  705 F.3d 1122 (9th Cir. 2013) ................................................................. 6, 7

*Lucy v. Bay Area Credit Servs. LLC,*
  792 F. Supp. 2d 320 (D. Conn. 2011) ......................................................... 12

*Merrill Lynch Int'l Fin., Inc. v. Donaldson,*
  895 N.Y.S.2d 698 (Sup. Ct. 2010) ............................................................. 13

*Murphy v. DirectTV, Inc.,*
  724 F.3d 1218 (9th Cir. 2013) ................................................................. passim

*Ross v. Am. Express Co.,*
  547 F.3d 137 (2d Cir. 2008) ............................................................. 2, 11, 14, 16

**TABLE OF AUTHORITIES**
(continued)

Page

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
  542 F.3d 354 (2d Cir. 2008) ................................................................. passim

*Uptown Drug Co. v. CVS Caremark Corp.*,
  962 F. Supp. 2d 1172 (N.D. Cal. 2013) ................................................ 7, 12, 13

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
  489 U.S. 468 (1989) ............................................................................. 6, 8

**Statutes**

New York Gen. Bus. Law § 349 ............................................................. 15

1    **I.      STATEMENT OF THE ISSUE**

2           May Defendant compel Plaintiffs to arbitrate their claims on the basis of an arbitration

3    clause that (1) appears in Plaintiffs' contract with a non-party to the action, and (2) does not name

4    Defendant as a beneficiary?

5    **II.     SUMMARY OF ARGUMENT**

6           Plaintiffs have brought two causes of action against Turn Inc. ("Turn") arising from

7    Turn's secret and unwanted monitoring of their online activity through so-called "zombie

8    cookies" that cannot be evaded or deleted. Plaintiffs never agreed to arbitrate claims it might have

9    against Turn. Indeed, until Turn's monitoring activities received broad public scrutiny, Plaintiffs

10   had never heard of Turn. Turn nonetheless believes that Plaintiffs' claims should be dismissed on

11   the basis of an arbitration clause that appears in a contract between Plaintiffs and Plaintiffs'

12   wireless carrier, Verizon. The purported basis for this result is the doctrine of estoppel.  However,

13   application of estoppel in the present circumstance would run contrary to legal precedent and to

14   the purpose of the doctrine.

15          As is well established under both California and New York law, estoppel only applies if—

16   as judged by the face of the complaint—the plaintiff seeks to *access* a contractual right but to

17   *avoid* a contractual obligation to arbitrate. "Even if . . . Plaintiffs' claims on some abstract level

18   require the existence of the [contract containing an arbitration provision], the law is clear that this

19   is not enough for equitable estoppel." *See Murphy v. DirectTV, Inc.*, 724 F.3d 1218, 1230 (9th

20   Cir. 2013). Instead, the plaintiffs' legal claims must "depend on the Agreement's terms." *Id.* at

21   1231. This rule reflects the purpose of the estoppel doctrine: "to prevent a party from using the

22   terms or obligations of an agreement as the basis for his claims against a nonsignatory, while at

23   the same time refusing to arbitrate with the nonsignatory under another clause of that same

24   agreement." *Id.* at 1230. The mere collaboration between a signatory and a non-signatory to an

25   arbitration contract—indeed, even their active collusion—is insufficient to permit the non-

26   signatory to enforce the arbitration agreement. Instead, the focus is on the plaintiff's claims.

27   Arbitration is required only if the plaintiff's allegations of collusion are "founded in or intimately

28   connected with the obligations of the underlying agreement." *See id.* at 1229. This result is

1   consistent with the general rule that arbitration is a matter of consent—if a plaintiff could not

2   have reasonably foreseen that she would have to arbitrate against a non-signatory, she may not be

3   compelled to do so. *See Ross v. Am. Express Co.*, 547 F.3d 137, 146 (2d Cir. 2008); *Sokol*

4   *Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361–62 (2d Cir. 2008).

5         Here, Plaintiffs do not raise any claims against Turn that depend on their contracts with

6   Verizon. Plaintiffs' claims are based on Turn's independent misconduct. Nothing in the Verizon

7   contracts alerted Plaintiffs to Turn's existence, much less to the possibility that they would have

8   to arbitrate claims against Turn. In these circumstances, neither the cases establishing the estoppel

9   doctrine nor the rationale behind the doctrine permits Turn to enforce Verizon's arbitration

10   agreement. Turn's Motion to Dismiss (or in the Alternative to Stay) this Action to Compel

11   Arbitration should be denied.

12   **III.   STATEMENT OF FACTS**

13         Turn's statement of facts—supplemented by ample citation to declarations and other

14   materials outside the pleadings—is largely devoted to the contention that it did nothing wrong.

15   *See* Dkt. 20, Br. at 2–7. However, the merits of Plaintiffs' claims are not at issue here. *See JLM*

16   *Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004) ("Determination of the

17   arbitrability of . . . claims . . . does not in any way rest upon the strength of those claims."").

18   Rather, the focus at this stage is on Plaintiffs' claims and whether those claims are arbitrable

19   under the terms of a contract. Plaintiffs' statement of facts thus focuses on the allegations in the

20   Complaint and on the contracts at issue.

21         **A.   Turn surreptitiously tracked Plaintiffs.**

22         The present case involves Turn's efforts to secretly and persistently track Plaintiffs

23   through their mobile devices. The purpose of this tracking is to create detailed profiles of mobile

24   users, which Turn then profits from by selling advertisements to companies that would like to

25   target specific demographics of consumers. Turn essentially acts as an unseen middleman in the

26   world of online advertising. By partnering with specific websites, Turn is able to learn about the

27   entirety of users' activity on the Internet. It then sells advertisers access to that information so that

28   they may better target their ads. *See* Compl. ¶¶19, 25–26.

1    From a technological standpoint, Turn's tracking ability depends on something called a

2    "cookie," which is a piece of code transmitted from a website to a user's web browser. Some

3    cookies ("first-party cookies") enable websites to remember a user's login credentials or

4    preferences. Other cookies ("third-party cookies") are planted by marketers as a means of

5    tracking users. As long as it is active, a third-party cookie will transmit a user's web-browsing

6    history back to the third party that generated the cookie, thereby allowing the third party to glean

7    valuable information about the user's Internet history and (presumed) interests. *See id.* ¶27.

8    However, as users have become increasingly aware of third-party tracking cookies and their

9    attendant threat to privacy, a demand has arisen for methods to prevent unknown third parties

10   from monitoring one's Internet activity. As a result, for those concerned about the privacy

11   implications of surreptitious web tracking, there now exist established, well-known, and easily

12   accessible means for blocking and deleting (or "clearing") cookies, thereby preventing third

13   parties' ability to track users and create profitable profiles of them. *See id.* ¶¶28–32.

14   Turn employed a method of tracking that purposely thwarted such do-not-track

15   mechanisms, allowing it to continue to track users through third-party cookies even when the user

16   took express steps—widely recognized as industry standard—to prevent such surreptitious

17   monitoring. Turn's method exploits something called a "unique identifier header"—referred to

18   interchangeably in the Complaint as an "UIDH" or an "X-UIDH"— which is a piece of code that

19   identifies the specific computer or device that is requesting to see a website. At some point in

20   2012, Verizon incorporated unique identifier headers into requests sent from its mobile devices.

21   *See id.* ¶40.  Subsequently, Turn configured its tracking cookies to include, as a data point, the

22   unique identifier header for all web requests from Verizon customers, thus allowing the company

23   to evade the Plaintiffs' and Class members' attempts to prevent tracking of their web history (and

24   exposure of that history to marketers). *See id.* ¶¶41–42.

25   As discussed above, Turn partners with specific companies that allow Turn to track users

26   of their websites through third-party cookies. Turn compiles a database of information it receives

27   from users of its partner sites. If the user succeeded in clearing cookies, however, Turn would

28   lose its ability to track the user (and thus to profile and profit from her). This is where the unique

1   identifier header comes in. During the relevant time period—until Turn ceased its practice in the

2   face of public pressure and condemnation from Verizon—Turn monitored the traffic of its partner

3   websites, and when a Verizon customer attempted to access one of those websites via her mobile

4   device, Turn compared the information in the request sent from the mobile device against a list of

5   existing unique identifier headers in the database it had compiled from serving prior cookies. The

6   goal was to match the customer's unique identifier header with a unique identifier header already

7   in its database. Whenever Turn found a match—even if the customer had previously cleared her

8   device of cookies in an effort not to be monitored—the company would simply place a new

9   cookie on the customer's device that contained all of the values from the old cookies in its

10  database. Turn was thereby able to exploit the unique identifier header to resume monitoring that

11  would have otherwise been interrupted.

12          In the technological parlance, Turn created a "zombie cookie"—that is, a cookie that

13  sprang back to life upon Turn's matching of a unique identifier header in a new web request to

14  one in its database. Turn tracked users in this manner regardless of whether they previously

15  cleared their devices of cookies in an effort not to be monitored. By harnessing the unique

16  identifier header—a static marker that the user could never change—Turn could merge the user's

17  prior, deleted browsing history with any subsequent browsing history, despite any attempt by the

18  individual to protect her privacy. *See id.* ¶¶43–46. Thus, as the Complaint alleges, "Turn

19  knowingly inserted code—in the form of X-UIDH-augmented zombie cookies—onto the devices

20  of Plaintiffs and Class members, exploiting a routing feature inherent to Verizon's infrastructure."

21  *Id.* ¶48. This surreptitious tracking extended to the *entirety* of a Verizon user's mobile device

22  (including apps) and was not limited to web searches. *See id.* ¶¶49–54.

23          Turn did not reveal these tracking practices to its users. Instead, they were discovered by

24  independent researchers and thereafter given broader exposure through the media. *See id.* ¶¶41–

25  42. When Turn's practices were exposed, Verizon took pains to distance itself from them. For

26  example, one of Verizon's technology directors condemned Turn's actions in comments to the

27  *New York Times*: "[Turn] did not talk to me. If they did, I would not have been satisfied." *Id.* ¶62.

28  Verizon issued a statement assuring the public that Turn's actions would cease and that Verizon

would ensure that other partners used the unique identifier header "consistent with the purposes we intended." *Id.* ¶63. Plaintiffs thereafter brought the instant action alleging that Turn's tracking behavior is a deceptive practice forbidden under N.Y. Gen. Bus. Law § 349 and that Turn committed trespass to chattels.

### B.   Verizon's arbitration clause does not benefit Turn, which is independent of Verizon by the terms of their agreement.

Plaintiffs do not have a contractual relationship with Turn. Instead, Turn asserts that Plaintiffs are required to arbitrate because their agreements with Verizon—an entity that is neither a party to this action nor implicated in Plaintiffs' claims—contain an arbitration provision. The provision states that "You [*i.e.*, Plaintiffs] and Verizon Wireless both agree to resolve disputes only by arbitration or in small claims court." *See* Dkt. 20, Br. at 1; Dkt. 21, Paddock Decl. ¶19; Dkt. 22, Giotis Decl. ¶16. The arbitration provision that Turn relies on does not purport to encompass Turn specifically or third parties more generally.

The relationship between Verizon and Turn is governed by the Turn Audience Platform Agreement, executed November 7, 2012. *See* Dkt. 24, Narvaez Decl. ¶13. The agreement specifically states that Verizon and Turn are independent of one another: ███████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████   *See* Dkt. 24-1, Verizon/Turn Agreement § 10.1 (filed under seal). Thus, by the terms of their own agreement, Turn and Verizon are independent rather than interdependent actors.

## IV.   ARGUMENT

As the U.S. Supreme Court has repeatedly explained, "arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011). "[T]he FAA does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that arbitration proceed *in the manner provided for in [the parties'] agreement.*" *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474–75 (1989)

1   (internal quotation marks omitted) (alteration in original). Turn has no agreement with Plaintiffs;

2   nor does Plaintiffs' agreement with Verizon envision that Plaintiffs will be required to arbitrate

3   disputes with parties other than Verizon. Given that no contractual agreement requires Plaintiffs

4   to arbitrate their claims against Turn, Turn is forced to rely on the doctrine of estoppel, which

5   permits non-signatories to an arbitration clause to enforce the clause in limited circumstances.

6   However, application of the doctrine here is inconsistent with its purpose. As a complete analysis

7   of California and New York cases reveals, arbitration-related estoppel is only required if—as

8   judged by the face of the complaint—the plaintiff seeks to access a contractual right but to avoid

9   a contractual obligation to arbitrate. That is not the case here, where Plaintiffs' claims target Turn

10   alone and in no way rely upon their contracts with Verizon.

11
       **A.**      **The relevant legal question is whether Plaintiffs seek to access rights in**
12                **Verizon's contract while avoiding an obligation to arbitrate that appears in**
                **the same contract.**

13       The doctrine of equitable estoppel "precludes a party from claiming the benefits of a

14   contract while simultaneously attempting to avoid the burdens that contract imposes." *Kramer v.*

15   *Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (quoting *Comer v. Micor, Inc.*, 436

16   F.3d 1098, 1101 (9th Cir. 2006)). When determining whether a party to a contract must arbitrate a

17   claim against a non-signatory, courts look to the face of the complaint and the claims therein. *See*

18   *In re Carrier IQ, Inc. Consumer Privacy Litig.*, No. 12-2330, 2014 U.S. Dist. LEXIS 42624 (N.D.

19   Cal. Mar. 28, 2014) (citing *In re Apple iPhone 3G Prods. Liab. Litig.*, 859 F. Supp. 2d 1084,

20   1096–97 (N.D. Cal. 2012)) (finding that non-signatory's estoppel argument required court to

21   consider "the allegations in the operative complaint, along with the wireless carrier customer

22   agreements themselves"). This approach is consistent with the purpose of the estoppel doctrine,

23   which is to prevent litigants from availing themselves of contractual rights without also

24   submitting to contractual obligations. *See, e.g.*, *Kramer*, 705 F.3d at 1128.

25       Ultimately, the question of whether equitable estoppel applies is answered by state law.

26   *See Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009). Though Turn initially states that

27   New York law applies,[1] it relies heavily on California cases and asserts that "the result is the

28   ────────────────────
[1] Turn asserts that New York law applies via a choice-of-law clause in Plaintiffs' contracts with

*Footnote continued on next page*

1    same here whether New York or California law applies." Dkt. 20, Br. at 11. Plaintiffs agree with

2    that assertion. The Court need not wade into a choice-of-law analysis, because there is no conflict

3    between New York and California law.[2] In the absence of legal conflict, courts apply the law of

4    the home jurisdiction—here, California. *See Homedics, Inc. v. Valley Forge Ins. Co.*, 315 F.3d

5    1135, 1138 (9th Cir. 2002) ("When neither party identifies a meaningful conflict between

6    California law and the law of another state, California courts apply California law."). Each state

7    applies an "intertwined" test and each demands the same result. However, that result is not the

8    one Turn advocates, because the claims in the Complaint—which assert deceptive practices *by*

9    *Turn* and trespass to chattels *by Turn*—are not intertwined with Plaintiffs' contracts with Verizon

10   and do not attempt to assert rights provided in those contracts.

11            **1.      Under either body of law, estoppel does not apply unless the plaintiff's**
                        **claims rely on a contract containing an arbitration clause.**

12            Both the Ninth Circuit and the Second Circuit have recently clarified the circumstances in

13   which estoppel permits a non-signatory to compel arbitration of claims. Tellingly, Turn fails to

---

*Footnote continued from previous page*

Verizon. This clause states, "Except where we've agreed otherwise elsewhere in this agreement, this agreement and any disputes covered by it are governed by . . . the laws of the state encompassing the area code of your wireless phone number when you accepted this agreement, without regard to the conflicts of laws rules of that state." *See* Dkt. 21-9, Henson/Verizon Agreement at 8; Dkt. 22-2, Cintron/Verizon Agreement at 33. Turn in no way explains how the claims at issue in this case are "disputes covered by" Plaintiffs' agreements with Verizon, as their agreements with Verizon do not involve Turn (or even make Plaintiffs aware that Turn exists). Moreover, as one court in this district has explained, "[a] district court exercising diversity jurisdiction must apply the law of the state in which it sits when determining the validity of an arbitration clause." *Uptown Drug Co. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172, 1179 (N.D. Cal. 2013). However, as discussed below, the result is the same regardless of which state's law applies.

[2] Turn claims that the California test is "more narrowly-phrased" than the New York test. Dkt. 20, Br. at 11. However, Turn provides no explanation why that is so, perhaps because the tests contain semantic differences at best. Indeed, *Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410 (Sup. Ct. 2005)—the case that Turn cites as the source of the New York test— speaks of estoppel in a manner that is functionally identical to the California language. *Compare Hoffman*, 789 N.Y.S.2d at 415 (stating that equitable estoppel applies when "each of a signatory's claims against a non-signatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate") *with Uptown Drug*, 962 F. Supp. 2d at 1184 (stating that estoppel applies "when a signatory must rely on the terms of the written agreement in asserting its claims against the non-signatory or the claims are intimately founded in and intertwined with the underlying contract"). Semantic differences aside, each test has a singular purpose: to prevent a party from claiming rights under a contract while also avoiding the obligation to arbitrate under the same contract.

---

cite this authority its brief. These cases show that estoppel does not apply unless a plaintiff's claims are "intertwined" with a contract requiring arbitration, such that the plaintiff could have reasonably expected to arbitrate any claims she might have against a non-signatory to the arbitration agreement. It is not enough that the plaintiff's entrance into the contract made the plaintiff's claims possible—*i.e.*, that the plaintiff would have no claims against the non-signatory "but for" entering the contract—or that the signatory and non-signatory worked together in some fashion. Such a rule is sound, for it conforms to the general requirement that arbitration be a product of mutual consent. *See Volt Info. Scis.*, 489 U.S. at 474–75.

### a.    Ninth Circuit/California

The Ninth Circuit recently addressed the proper application of estoppel under California law in *Murphy v. DirecTV, Inc.*, 724 F.3d 1218 (9th Cir. 2013). The plaintiffs in *Murphy* sued both DirecTV and Best Buy based on claims that the companies tricked them into thinking they were buying equipment when they were really leasing it. *Murphy*, 724 F.3d at 1223–24. The plaintiffs were compelled to arbitrate with DirectTV, and Best Buy tried to compel arbitration based on DirectTV's agreement. The court applied the following standard under California law:

> Where a non-signatory seeks to enforce an arbitration clause, the doctrine of equitable estoppel applies in two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the non-signatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the non-signatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement.

*Murphy*, 724 F.3d at 1229. The court found that the first ("intertwined") prong of the test did not apply because "[t]he complaint is replete with allegations of deceit by Best Buy that have nothing to do with the Customer Agreement." *Id.* at 1230. Though the plaintiffs' claims against Best Buy would not have existed had they not contracted with DirecTV, the court rejected a pure but-for analysis: "Even if Best Buy is correct that Plaintiffs' claims on some abstract level require the existence of the Customer Agreement, the law is clear that this is not enough for equitable estoppel." *Id.* The court also rejected estoppel under the second ("interdependent misconduct") prong because "mere allegations of collusion are insufficient to trigger equitable estoppel" and

1    "allegations of collusive behavior by signatories and nonsignatories, with no relationship to the

2    terms of the underlying contract, does not justify application of equitable estoppel to compel

3    arbitration." *Id.* at 1232 (internal quotation marks omitted). The court emphasized that "[i]t is the

4    relationship of the *claims*, not merely the collusive behavior of the signatory and non-signatory

5    parties, that is key." *Id.* at 1231 (quoting *Goldman v. KPMG LLP*, 92 Cal. Rptr. 3d 534, 545 (Cal.

6    Ct. App. 2009)).

7         *Murphy* confirms that a non-signatory is not entitled to enforce an arbitration agreement

8    simply because it collaborates in some fashion with a signatory. Instead, the plaintiff's claims—as

9    assessed on the face of the complaint and on a claim-by-claim basis—must seek to enforce a right

10   in the contract containing the arbitration clause. Even if the signatory and non-signatory actively

11   colluded, as alleged in *Murphy*, the allegations in the complaint must tie the collusive conduct to

12   a right arising out of the underlying contract for estoppel to apply.

13        Consistent with *Murphy*, and in a case similar to this one, another court in this district

14   refused to permit a non-signatory to enforce wireless carriers' arbitration provisions. *See In re*

15   *Carrier IQ, Inc. Consumer Privacy Litig.*, No. 12-2330, 2014 U.S. Dist. LEXIS 42624 (N.D. Cal.

16   Mar. 28, 2014). There, the wireless carriers had licensed the defendants' software and instructed

17   the defendants to put the software on the wireless carriers' machines without the knowledge of

18   the end consumer (*i.e.*, plaintiffs). *See id.* at *20. The plaintiffs alleged that defendants intercepted

19   their personal information, in violation of various statutes. *See id.* at *22–23. The defendants

20   sought to avail themselves of the wireless carriers' arbitration clauses. Citing *Murphy*, the court

21   rejected the defendants' argument that arbitration was required because the wireless carriers'

22   contracts might establish a defense: "Defendants have cited no case where *defendant's* reliance on

23   a contract justifies the application of equitable estoppel against the *plaintiff* who does not rely on

24   the contract. A contrary holding would be divorced from the basic principle underlying the

25   equitable doctrine." *Id.* at *43. The court rejected the idea that the "intertwined" test is satisfied

26   "where an agreement is simply referred in the complaint or the existence of the agreement is

27   presumed." *Id.* at *44. The court also found the "interdependent misconduct" prong to be

28   unsatisfied, because the elements of plaintiffs' legal claims were not "predicated on allegations

that Defendants colluded or otherwise acted in concert with the wireless carriers," *id.* at *53, and

because "there is no interdependence between Plaintiffs' statutory claims and the terms of the

carriers' agreements," *id.* at *56.

### b.   Second Circuit/New York

In a series of recent cases applying the following "intertwined" test, the Second Circuit

has adopted an approach that corresponds to the Ninth Circuit's:

> [U]nder principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of the relationship among the parties, the contracts they signed . . . , and the issues that had arisen among them discloses that the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.

*JLM Indus.*, 387 F.3d at 177 (citing *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*,

271 F.3d 403, 406 (2d Cir. 2001)) (internal quotation marks omitted) (alteration in original). For

example, in *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 356–57 (2d Cir. 2008),

plaintiffs sued one oil-and-gas company, with which they did not have an arbitration agreement,

for tortiously interfering with their contract with another oil-and-gas company, with which they

did have an arbitration agreement. The non-signatory defendant argued that estoppel applied

because "plaintiffs' claims are 'intertwined' with the underlying contract, and because the factual

allegations supporting those claims 'touch matters' covered by the contract." *Sokol Holdings*, 542

F.3d at 356. More specifically, the defendant argued that the plaintiffs were required to prove that

the signatory breached the contract containing the arbitration clause in order to make out its claim

for tortious interference. *See id.* at 358–59. In refusing to compel arbitration, the court rejected the

notion that "whenever a relationship of any kind may be found among the parties to a dispute and

their dispute deals with the subject matter of an arbitration contract made by one of them, that

party will be estopped from refusing to arbitrate." *Id.* at 359. The court further explained that, "in

addition to the 'intertwined' factual issues, there must be a relationship among the parties of a

nature that justifies a conclusion that the party which agreed to arbitrate with another entity

should be estopped from denying an obligation to arbitrate a similar dispute with the adversary

which is not a party to the arbitration agreement." *Id.* In sum, the court found that "[t]he cases . . .

1   are consistent with the black letter rule that the obligation to arbitrate depends on consent. They

2   simply extend its contours somewhat by establishing that the consent need not always be

3   expressed in a formal contract made with the party demanding arbitration." *Id.* at 361–62.

4       The Second Circuit provided further definition to the estoppel doctrine in *Ross v. Am.*

5   *Express Co.*, 547 F.3d 137 (2d Cir. 2008). There, plaintiffs were Visa and Mastercard holders

6   who sued American Express for antitrust violations. *Ross*, 547 F.3d at 139. American Express

7   attempted to enforce the arbitration agreement appearing in plaintiffs' contracts with Visa and

8   Mastercard, on the grounds that its "status as an alleged co-conspirator with the entities which are

9   indisputably parties to the cardholder agreements allows it to avail itself of the compulsory

10  arbitration clauses in those agreements." *Id.* at 140. The court refused to compel arbitration and

11  instead accepted the plaintiffs' argument that "there [was] no reason for someone signing up for a

12  Chase Visa card, for example, to believe that he (or she) was entering into any kind of

13  relationship with [Amex]." *Id.* at 148 (alterations in original). The court concluded that it is not

14  enough for the non-signatory defendant to have performed some function under a contract

15  containing an arbitration clause or for the defendant to have colluded with the signatory: "In sum,

16  arbitration is a matter of contract and, contractually speaking, the plaintiffs do not know Amex

17  from Adam. Amex therefore cannot avail itself of the arbitration agreements contained in the

18  cardholder agreements." *Id.* at 146.

19      In light of *Sokol* and *Ross*, courts within the Second Circuit have stated that "the *sine qua*

20  *non* of an appropriate situation for applying equitable estoppel is [t]he plaintiff's actual

21  dependence on the underlying contract in making out the claim against the non-signatory

22  defendant." *Different Drummer LLC v. Nat'l Urban League, Inc.*, No. 11-4982, 2012 U.S. Dist.

23  LEXIS 16494, at *17 (S.D.N.Y. Feb. 7, 2012) (citing *Denney v. Jenkens & Gilchrist*, 412 F.

24  Supp. 2d 293, 298 (S.D.N.Y. 2005)) (internal quotation marks omitted) (alterations in original);

25  *accord Bowery Presents LLC v. Pires*, 2013 N.Y. Misc. LEXIS 2678, at *11 (N.Y. Sup. Ct.

26  June 24, 2013). The courts have likewise rejected non-signatories' attempts to compel arbitration

27  when there is no indication that the plaintiff intended to arbitrate a dispute with a non-signatory.

28  *See Butto v. Collecto Inc.*, 845 F. Supp. 2d 491, 498 (E.D.N.Y. 2012) (rejecting collection

1    agency's attempt to enforce arbitration clause in wireless contract and stating that "even if the

2    Plaintiffs in this case had made conspiracy allegations, which they do not, this would be

3    insufficient to find estoppel"); *Lucy v. Bay Area Credit Servs. LLC*, 792 F. Supp. 2d 320, 327–28

4    (D. Conn. 2011) (rejecting collector's attempt to enforce arbitration clause in wireless contract

5    where it was "not named in the Wireless Service Agreement as having specific duties under that

6    Agreement" and where "the court has not been presented with any evidence that Lucy treated Bay

7    Area Credit and AT&T interchangeably").

8       **2.    Turn's cases do not require Plaintiffs to arbitrate their claims against**

9              **Turn.**

10        The entirety of Turn's legal analysis mistakenly revolves around two inapposite and

11   outdated California district court cases decided before the Ninth Circuit's *Murphy* decision:

12   *Uptown Drug Co. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172 (N.D. Cal. 2013), and *In re*

13   *Apple iPhone 3G Prods. Liab. Litig.*, 859 F. Supp. 2d 1084 (N.D. Cal. 2012). These cases contain

14   significant factual differences from the present case. In *iPhone*, the plaintiffs sued Apple and

15   AT&T for misrepresenting the speed of AT&T's network. The plaintiffs had an arbitration clause

16   with AT&T but not Apple. The plaintiffs tried to drop AT&T from the case, but the court

17   required that AT&T be included as a necessary party. *See iPhone*, 859 F. Supp. 2d at 1087–88.

18   The court then observed that it had "repeatedly held, in relation to previous iterations of the

19   Complaint, that Plaintiffs' allegations against Defendant Apple could not be 'reasonably

20   separate[d]' from Plaintiffs' allegations against Defendant ATTM." *Id.* at 1093. Importantly, the

21   court's conclusion was compelled by *the plaintiffs' own allegations*. The claims against Apple

22   were "intertwined" because "Plaintiffs themselves have contended throughout this litigation that

23   their claims against Defendant Apple and Defendant ATTM arise from their service agreements

24   with ATTM." *Id.* at 1096. Likewise, in *Uptown Drug*, the court considered whether three CVS

25   entities could compel arbitration of trade-secrets claims on the basis of an arbitration agreement

26   the plaintiff signed with a fourth CVS entity. *See Uptown Drug*, 962 F. Supp. at 1183–84. The

27   court applied estoppel because "Uptown alleges that Defendants acted in concert in

28   misappropriating Uptown's customer data." *Id.* at 1185. Here, by contrast, Plaintiffs have not

presented claims arising from their contracts with Verizon, and the Complaint does not allege that Turn and Verizon acted in concert. Moreover, even if *iPhone* and *Uptown Drug* suggest a broad interpretation of the estoppel doctrine, that interpretation has lost its force after *Murphy*, which postdates them.[3] After *Murphy*, the rule is clear: a plaintiff's legal claims must "depend on the Agreement's terms" for estoppel to apply. *Murphy*, 724 F.3d at 1231.

In addition to *Uptown Drug* and *iPhone*, Turn cites—without analysis—several New York state cases. In fact, these cases demonstrate that New York law applies the "intertwined" test in a manner consistent with the purpose of estoppel—that is, to prevent a party from exploiting a contractual right while avoiding the contractual obligation to arbitrate. For example, in *Hoffman*, the principal New York case on which Turn relies, three members of an LLC sought to enforce the LLC's operating agreement against the other members. 789 N.Y.S.2d at 411–12. Though the operating agreement contained a broad arbitration clause, the LLC was not a party to the agreement. *Id.* at 412. Rather than suing the other members of the LLC, the disgruntled members sued the LLC itself. *Id.* The court held that estoppel prevented the plaintiffs from avoiding arbitration in this manner: "[A] signatory . . . cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains the arbitration provision, but, on the other hand, deny the arbitration's applicability because the defendant is a non-signatory." *Id.* at 415 (internal quotation marks omitted). *Accord Merrill Lynch Int'l Fin., Inc. v. Donaldson*, 895 N.Y.S.2d 698, 703 (Sup. Ct. 2010) (stating that "a non-signatory who exploits a contract containing an arbitration clause is estopped from repudiating that clause"). Plaintiffs' claims here do not rely on a contract in the least, much less a contract containing an arbitration provision. Turn's New York cases are readily distinguishable.

Turn's truncated treatment of Second Circuit authority likewise does not withstand scrutiny. Rather than discussing *Sokol* or *Ross*, Turn cites—while again failing to analyze—cases in which the plaintiff sought to avoid arbitration by suing a parent, subsidiary, or agent of the

---

[3] Notably, *Carrier IQ* rejected *iPhone* as an appropriate basis for compelling arbitration. Unlike the claims in *iPhone*, the claims in *Carrier IQ* "did not arise from the wireless carrier customer agreements. Rather, they [arose] from alleged statutory violations (not breaches of contract) by CIQ and Defendants for conduct separate and distinct from the interception and transmission of information to wireless carriers." *See Carrier IQ*, 2014 U.S. Dist. LEXIS 42624, at *49–50.

party with which it agreed to arbitrate. *See*, *e.g.*, *JLM Indus.*, 387 F.3d at 177–78 (permitting

corporate parents to arbitrate claims arising out of plaintiff's contracts with subsidiaries);

*Choctaw Generation Ltd. P'Ship v. Am. Home Assurance Co.*, 271 F.3d 403, 407 (2d Cir. 2001)

(compelling arbitration under an estoppel theory where the controversy between the signatory and

non-signatory "is essentially an aspect of the same controversy now in arbitration between the

two signatories" to an arbitration provision); *Birmingham Assocs. Ltd. v. Abbott Labs.*, 328 F.

App'x 42, 44 (2d Cir. 2009) (finding estoppel warranted where signatory's breach-of-contract

claim against non-signatory depended upon contract between plaintiff and non-signatory's parent

company). *Sokol* and *Ross* specifically distinguished such cases and held that their rationale does

not apply when a plaintiff sues an entity unrelated to the signatory of the arbitration clause. *See*

*Ross*, 547 F.3d at 144–45; *Sokol*, 542 F.3d at 358–62.[4] Those cases are inapplicable here

because—as their own agreement makes clear—Turn and Verizon are unaffiliated entities. Quite

the opposite: Turn is neither mentioned in Verizon's contracts with Plaintiffs nor given tasks to

perform under those contracts.

### 3.   **Summary**

When a complete analysis of the estoppel doctrine is brought to bear, several principles

emerge. First, estoppel is assessed by the allegations in the plaintiff's complaint, not by the

defendant's potential defenses or by material that falls outside the pleadings. Second, the primary

question is whether the plaintiff's claims are premised upon a right or obligation in the contract

that contains the arbitration clause the defendant wishes to enforce. Third, the defendant's

collaboration with a signatory to an arbitration clause does not, by itself, permit the defendant to

enforce the arbitration clause. Rather, the plaintiff's *legal* claims must depend upon a contract

containing the arbitration clause. These principles are all consistent with the traditional estoppel

rationale: a party cannot rely on a contract for its claims and then reject arbitration required by the

contract.

---

[4] Though *Ross* recognized that *Choctaw* is not a subsidiary/parent case, it distinguished *Choctaw* as a case where a non-signatory to a contract containing an arbitration clause was "named therein as having certain tasks to perform under that contract." *Ross*, 547 F.3d at 145. By contrast, Turn is not named in Verizon's contract.

**B.     Estoppel does not require Plaintiffs to arbitrate their claims against Turn.**

Given the legal principles discussed above, does the estoppel doctrine permit Turn to compel arbitration of Plaintiffs' claims? The Complaint manifestly demonstrates that the answer is "no." The Complaint alleges two causes of action: (1) deceptive conduct under New York Gen. Bus. Law § 349; and (2) trespass to chattels. These claims are based upon Turn's exploitation of a feature of Verizon's infrastructure in order to invade Plaintiffs' privacy and convert their information to monetary gain. It was Turn that maintained a database of unique identifier headers, Turn that sought to find users on its partner sites who had a matching unique identifier header, and Turn that tracked those users for its own benefit (regardless of whether a user had expressed a desire not to be tracked). None of these allegations arise from Plaintiffs' contracts with Verizon. They do not even assert that Turn colluded with Verizon. Indeed, Verizon specifically condemned Turn's actions. The wrongdoing at issue is Turn's alone.

Under these circumstances, the estoppel analysis is straightforward. The "*sine qua non*" of estoppel—that the plaintiff's claims be "intertwined" with the contract containing an arbitration agreement—is absent because the Complaint raises no claim that invokes rights under the agreement (or that even requires interpretation of it). *See Murphy*, 724 F.3d at 1230; *Different Drummer*, 2012 U.S. Dist. LEXIS 16494, at *17. Turn's only argument for satisfying this requirement is that it may have a defense under Verizon's privacy policy, which says Verizon "may provide third-party advertisers with the ability to target their ads using geographic or demographic information about customers." *See* Dkt. 20, Br. at 2. Even if this disclosure could have alerted Plaintiffs to the full scope of Turn's misconduct, including disregard for users' opt-out requests and cookie-clearing efforts—which it did and could not—the possibility that language in a contract could establish a defense does not permit a non-signatory to that agreement to force arbitration. *See Carrier IQ*, 2014 U.S. Dist. LEXIS 42624, at *43. Moreover, Verizon's contract does not alert Plaintiffs that they might have to arbitrate claims against a third party such as Turn, as is required to ensure Plaintiffs' consent to such a procedure. *See Ross*, 547 F.3d at 146; *Sokol*, 542 F.3d at 361–62. In sum, the basic requirements of estoppel—that the plaintiff raise claims under a contract against a party with which it could have expected to arbitrate—are

- 15 -

1    wanting here.

2          Turn's five arguments for applying estoppel[5] boil down to a "but-for" test: because

3    Verizon and Turn worked together, and because Plaintiffs would have no claim if they had not

4    used Verizon devices, Plaintiffs must arbitrate their claims against Turn. The Court should reject

5    this approach as categorically at odds with the caselaw as well as with the purpose of the estoppel

6    doctrine. Because "mere allegations of collusion are insufficient to trigger equitable estoppel,"

7    Turn must do more than point to its relationship with Verizon. *Murphy*, 724 F.3d at 1232. It must

8    tie the elements of Plaintiffs' legal claims to Verizon's contract. This Turn does not and cannot

9    do, for the causes of action in the Complaint focus entirely on Turn's independent misconduct in

10   tracking Plaintiffs. Given that the Complaint is based on Turn's independent wrongdoing—not on

11   rights and obligations established in the Verizon contract—the Complaint's limited discussion of

12   Plaintiffs' Verizon agreements is unremarkable. Though Verizon made Turn's actions possible—

13   Turn could not have created zombie cookies without Verizon's unique identifier header—that

14   connection is too tenuous to require estoppel. "Even if [Turn] is correct that Plaintiffs' claims on

15   some abstract level require the existence of the [subscriber agreement], the law is clear that this is

16   not enough for equitable estoppel." *Id.* at 1230.

17         Finally, Turn's argument that one of Plaintiffs' counsel sued both Verizon and Turn in a

18   previous complaint—alleging different legal theories on behalf of a different plaintiff—has no

19   relevance to the estoppel analysis. As a preliminary matter, suits are brought by plaintiffs, not by

20   counsel, and estoppel applies to the parties, not to their counsel's participation in separate actions.

21   Moreover, in the controlling case of *Murphy*, the *relevant* plaintiff *actually sued* the signatory and

22   the non-signatory and alleged collusive behavior; however, the presence of the signatory in the

23   case did not alter the estoppel analysis the Ninth Circuit applied to the non-signatory. *See*

24

25   _____

     [5] These reasons are: (1) that "the subscriber agreement is what gave Plaintiffs access to the
     Verizon Internet service that underlies their claims"; (2) that "Turn used the UIDH only because
     Turn partnered with Verizon"; (3) that Plaintiffs' claims "are based on interdependent and
26   concerted conduct by Verizon and Turn"; (4) that "whether Plaintiffs were on notice of and
     authorized the alleged activities 'must be answered by looking at the terms of [Plaintiffs'
27   subscriber agreements]'"; and (5) that "Plaintiffs' claims against Turn *necessarily* rely on the
     relationship between Verizon and Plaintiffs created by their subscriber agreements." Dkt. 20, Br.
28   13–14.

1   *Murphy*, 724 F.3d at 1229; *see also Carrier IQ*, 2014 U.S. Dist. LEXIS 42624, at *51–52

2   (rejecting the argument that arbitration should be compelled because "Plaintiffs should not be

3   able to avoid arbitration simply by taking the tactical strategy of not naming the wireless carriers

4   with whom they would clearly be required to arbitrate" and where "in at least some of the

5   member cases, the plaintiffs did originally sue wireless carriers"). Here, if anything, the analysis

6   of Turn's argument is more streamlined than in *Murphy* or *Carrier IQ*, as Plaintiffs have not sued

7   the signatory and have alleged that the signatory condemned and distanced itself from the non-

8   signatory defendant's conduct, rather than embraced or cultivated it.

9       In sum, estoppel focuses on the claims in a plaintiff's complaint and inquires whether the

10  elements of those claims are premised on a contract that contains an arbitration clause. Is the

11  plaintiff seeking to access a contractual right but to avoid a contractual obligation to arbitrate? If

12  so, then the plaintiff cannot avoid the arbitration clause. If not, then the plaintiff cannot be

13  compelled to arbitrate merely because the contract has some factual relevance to the case.

14  Compelling arbitration under such circumstances would violate the bedrock principle that

15  arbitration is a matter of consent. Because Plaintiffs' claims here do not invoke rights occurring

16  under Verizon's contract and are instead focused squarely on Turn's misconduct, Turn may not

17  compel Plaintiffs to arbitrate.

18  **V.    CONCLUSION**

19      Plaintiffs' claims in this action concern Turn's independent conduct. Plaintiffs did not

20  agree to arbitrate with Turn. Plaintiffs' contracts with Verizon contain arbitration provisions, to

21  be sure, but Turn cannot enforce them because Plaintiffs' claims against Turn do not arise under

22  those contracts. Accordingly, Plaintiffs respectfully request that Turn's Motion to Dismiss (or in

23  the Alternative to Stay) this Action to Compel Arbitration be denied.

24  Dated:  June 12, 2015                Respectfully submitted,

25                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

26                                       By:  *s/ Michael W. Sobol*

27                                       Michael W. Sobol (CA 194857)
28                                       msobol@lchb.com
                                         Nimish R. Desai (CA 244953)

1  | ndesai@lchb.com
   | 275 Battery Street, 29th Floor
2  | San Francisco, CA  94111-3339
   | Telephone:  415.956.1000
3  | Facsimile:  415.956.1008

4  | Nicholas Diamand
   | ndiamand@lchb.com
5  | LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   | 250 Hudson Street, 8th Floor
6  | New York, NY  10013-1413
   | Telephone:  212.355.9500
7  | Facsimile:  212.355.9592

8  | Hank Bates (CA 167688)
   | hbates@cbplaw.com
9  | CARNEY BATES & PULLIAM PLLC
   | 2800 Cantrell Road, Suite 510
10 | Little Rock, AR  72202
   | Telephone:  501.312.8500

11

12 | Bradley S. Clanton
   | brad@clantonlegalgroup.com
   | CLANTON LEGAL GROUP PLLC
13 | 627 Mohawk Avenue
   | Jackson, MS 39216
14 | Telephone:  601-454-8794
   | Facsimile:  866-421-9918

15

16 | *Attorneys for Plaintiffs and the Proposed Class*

17

18

19

20

21

22

23

24

25

26

27

28